IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SHALANI IMURA,<br><br>                    Plaintiff,<br><br>v.<br><br>DELTA AIRLINES, INC. and<br>AMBER LAUDERDALE,<br><br>                    Defendants. | Civil Action File No. |

## COMPLAINT

Plaintiff, Shalani Imura  ("Plaintiff" or "Ms. Imura"), by and through her

counsel of record, Jean Simonoff Marx of Marx & Marx, L.L.C., as and for her

Complaint, respectfully alleges as follows:

## INTRODUCTION

1.

This is an action under Title VII of the 1964 Civil Rights Act, 42 U.S.C.

§§2000e *et seq*. (hereinafter "Title VII"), for unlawful employment practices

1

by Defendant, Delta Airlines, Inc. ("Delta") on the basis of Plaintiff's transgender status, for sexual harassment based on the Plaintiff's transgender status and for appropriate relief for Ms. Imura who was and continues to be adversely affected by such practices. This is also an action under Title VII on the basis of Ms. Imura's Asian race, Asian ancestry and ethnicity.

This is also an action under 42 U.S.C. §1981 against Delta and Ms. Lauderdale based on Ms. Imura's race, ancestry and ethnic characteristics.

This is also an action under Georgia law against Delta and Ms. Lauderdale for invasion of privacy arising out of the public disclosure of the private, embarrassing, non-public, secluded and/or secret fact of Ms. Imura's transgender status, which disclosure was and is offensive and objectionable to a reasonable woman of ordinary sensibilities under the circumstances.

This is also an action under Georgia law against Delta and Ms. Lauderdale for invasion of privacy for the disclosure of false facts regarding the Plaintiff which disclosure depicted Plaintiff as something she is not.

In particular, Ms. Imura alleges that she is a Hawaiian male to female transgender person of Asian race, ancestry and ethnicity and culture with Asian facial characteristics. Ms. Imura has been employed by Delta since in or about May, 2007 and at all relevant times was a Flight Attendant (hereinafter "FA")

based out of its Hartsfield-Jackson Atlanta International Airport (hereinafter "ATL") operations.

During the course of her employment at Delta, Ms. Imura transitioned from her male gender assigned at birth to female. During the course of her employment and of this transition Ms. Imura worked in different capacities as a FA, joining Delta's IFS (In-Flight Services) Charter Program in or about 2020, after she had transitioned and fully presented as female.

Delta's IFS Charter Program supports the FA service, staffing, and training for Delta charter flights, that are provided outside of Delta's normal flight operations, to particular clients, including professional sports teams. Ms. Imura joined the IFS Charter Program in or about 2020 serving the charter flights for the Tennessee Titans professional football team. At this time Ms. Imura presented as female and no one would have known about her status as a transgender person. Ms. Imura did not disclose that private fact to any coworker, customer, or to anyone at Delta, to its IFS Charter Program personnel, or to anyone on the Tennessee Titans football team, until such time as she filed her complaint with Delta in or about the summer of 2023, alleging discrimination and harassment *inter alia* based on her trans status.

During the times relevant to this Complaint, Ms. Imura was part of an FA team servicing the charter flights for the NFL sports team, the Tennessee Titans from 2020 until she had to remove herself from the hostile environment created by Defendant Amber Lauderdale after Ms. Lauderdale had harassed her for years, culminating in Ms. Lauderdale precipitating Ms. Imura's demotion on or about July 10, 2023. Amber Lauderdale, an African American female, was lead FA, and held herself out as speaking "for the team" and as acting on behalf of Delta.

Ms. Lauderdale made known to Ms. Imura and to Ms. Imura's colleagues that she held an anti-trans and anti-Asian bias, in fact stating to other FA's on repeated occasions that she did not like Ms. Imura and wanted to get rid of her. Ms. Lauderdale consistently outed Ms. Imura, discussed her being trans, and that she wanted Ms. Imura off the Titans charter roster from 2020, repeatedly, through at least July 2023, when Ms. Lauderdale was successful in getting Ms. Imura demoted from Primary flight attendant, after which Ms. Imura no longer flew with Ms. Lauderdale.

During the course of Ms. Imura working with Ms. Lauderdale as part of the FA team for the Titans charter, Ms. Lauderdale subjected Ms. Imura to ongoing harassment, differential treatment and bullying because of Ms. Imura being trans, and also Asian. Ms. Lauderdale outed Ms. Imura to other FA's and to Titans team

4

members, repeatedly made negative comments about her being trans, isolated and excluded Ms. Imura, treated Ms. Imura differently, singled her out for criticism when other FA's' conduct allegedly violated the same protocol, and in other ways on a daily basis created an unwelcome environment designed to get Ms. Imura to quit or to leave, and at the least making the environment hostile for her to work in. Ms. Lauderdale manipulated trip assignments so that Ms. Imura was unable to pick up trips, which caused Ms. Imura to suffer loss of income. Ms. Lauderdale also was instrumental in affecting Ms. Imura's "ranking" so that she was demoted from "Primary" FA to "Alternate" FA in July 2023, also causing Ms. Imura to suffer loss of income.

Ms. Imura followed Delta's protocols for reporting illegal harassment and discrimination. Delta alleges that it conducted a thorough investigation which it told the EEOC failed to corroborate Ms. Imura's allegations of harassment, discrimination and retaliation. But this was false.

Delta never thoroughly investigated Ms. Imura's complaints, and instead the purported investigation turned into one focused on race, after Amber Lauderdale, an African American female, made racial allegations against one Graem Wagner, a female Caucasian FA on the FA team servicing the Titans. Ms. Wagner had been a witness who had corroborated Ms. Imura's allegations of harassment and

discrimination based on her trans status, and Asian race, ethnicity, ancestry and culture. On information and belief, to the extent that Delta's investigation involved investigating Ms. Imura's allegations, witnesses corroborated Ms. Imura's allegations, including that Amber Lauderdale manipulated scheduling and affected the ranking system, which effectively demoted Ms. Imura and caused her to suffer loss of income. A Delta Senior Base Manager, for ATL In-Flight Services told Ms. Imura that investigation had been put "under the table."

Ms. Imura seeks declaratory, injunctive and equitable relief, and money damages for redress of rights secured to her by the above statutes and under applicable Georgia state law. Plaintiff also seeks an award of attorneys' fees and costs, pursuant to 42 U.S.C. §1988 as well as under Georgia state law, OCGA § 13–6–11.

<u>PARTIES</u>

2.

Plaintiff, Shalani Imura is a Hawaiian male to female transgender natural person residing in Nevada and is a United States citizen.

3.

Ms. Imura, though born as a male, has transitioned to female, appears female, presents as female not male, sounds female, and in every way identifies as female, not male.

4.

Ms. Imura completed her transition from male to female in 2013, including legally changing her name from Shawn Kumio Imura to Shalani Keiko Imura. Ms. Imura received an Order from the Lieutenant Governor of the State of Hawaii on or about July 10, 2013 legally changing her name to the female Shalani Keiko Imura. All of Ms. Imura's legal documents have been changed to reflect her female gender, including her Social Security card, United States passport, and employment documents.

5.

Though a United States citizen, Ms. Imura's race, ethnicity, culture and ancestry is Asian/Hawaiian.

6.

Ms. Imura has been and continues to be an employee of Delta for approximately 18 years, since May 2007, and accordingly is an employee of Delta within the meaning of Title VII.

7.

On information and belief, Delta is a foreign, Delaware corporation, registered to do business with the State of Georgia.

8.

According to the Georgia Secretary of State's Registered Corporation website as of June 6, 2025, Delta's agent for service of process is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

9.

On information and belief, Delta is an employer within the meaning of Title VII, as it is engaged in an industry affecting interstate commerce and at all relevant times employed and continues to employ more than 15 employees.

10.

Delta is subject to suit under 42 U.S.C. §1981.

11.

Defendant Amber Lauderdale is an African American female natural person on information and belief residing in the State of Georgia, in the Northern District, Atlanta Division.

12.

On information and belief, at all relevant times, Ms. Lauderdale held herself out as "speaking for the team" and acting on behalf of Delta's IFS Charter Program, a charter department within Delta.

13.

Defendant Amber Lauderdale is subject to individual suit under 42 U.S.C. §1981.

14.

Ms. Lauderdale may be served as provided by the Federal Rules, which allow service pursuant to O.C.G.A. §9-11-4.

<u>JURISDICTION AND VENUE</u>

15.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343 for violations of Acts of Congress providing for equal rights of citizens. The jurisdiction of this Court is also invoked pursuant to 42 U.S.C. §§2000e *et seq*. ("Title VII") and 42 U.S.C. §1981. Supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) is also invoked over related claims arising under Georgia state law.

16.

Venue is proper in this district and division under 28 U.S.C. §1391 because

Delta conducts business in this District and Division,  on information and belief Ms.

Lauderdale is a resident within this District and Division, Plaintiff was based in

Atlanta, and under the jurisdiction of Delta's Atlanta base, including its HR, and

unlawful actions and practices alleged herein were committed within the Northern

District of Georgia. Delta told the EEOC "Imura . . . is employed as a FA [flight

attendant] based out of [sic] its Hartsfield-Jackson Atlanta international Airport

("ATL") operations."

## NATURE OF THIS ACTION

17.

This Complaint raises claims under Title VII for unlawful sex discrimination

and sexual harassment based on Ms. Imura's trans status, as well as her Asian race,

ethnicity, ancestry and culture. The complaint raises claims under 42 U.S.C. §1981

for unlawful discrimination and harassment based on Ms. Imura's Asian race,

ethnicity, ancestry and culture. The complaint also raises claims under Georgia state

law for invasion of privacy. The complaint seeks declaratory and permanent

injunctive relief, compensation for lost wages as a result of illegal and/or retaliatory

conduct, compensatory damages, punitive damages, all available damages for redress

10

of rights secured to Plaintiff by Title VII, 42 U.S.C. §1981 and Georgia state law, in addition to an award of attorneys' fees and costs, pursuant to 42 U.S.C. §1988 and O.C.G.A. §13–6–11.

<u>ADMINISTRATIVE PROCEDURES</u>
<u>AND SATISFACTION OF CONDITIONS PRECEDENT</u>

18.

Ms. Imura started working for Delta in or about May 22, 2007 as a Flight Attendant (FA).

19.

From 2020 through the present, Delta has discriminated against, and subjected Ms. Imura to a hostile workplace environment based on her status as a trans person and a person of Asian race, ancestry, decent and culture, including demoting her from Primary FA to Alternate FA on or about July 10, 2023.

20.

Ms. Imura timely filed an EEOC Charge on August 31, 2023, alleging sex discrimination and harassment based on her trans status and based on her race (Asian) and alleging retaliation.

21.

The EEOC issued a Right to Sue letter dated March 10, 2025.

11

22.

Norberta Pendleton, the EEOC Investigator, sent Ms. Imura an email on March 11, 2025 alerting her to the Notice of Right to Sue, which she attached to the March 11, 2025 email, so that Plaintiff received the Notice of Right to Sue on March 11, 2025.

23.

This Complaint is timely filed within 90 days of receipt of the Right to Sue letter.

24.

All conditions precedent to maintaining this action have been met.

## FACTS

25.

Ms. Imura started her employment at Delta as a Flight Attendant in or around May 2007.

26.

Between 2007 and 2020, Ms. Imura flew as a flight attendant for Delta's regular, non-charter flight operations.

27.

Ms. Imura was hired as a male in 2007 by Northwest Airlines, which later

merged with Delta Airlines in or about 2008, so that as of 2008, Ms. Imura was an

employee of Delta Airlines.  On information and belief, Delta regards Ms. Imura's

employment as starting in May 2007, which it told the EEOC.

28.

Ms. Imura presents as a female, looks female, sounds female and no stranger

would know that Ms. Imura had been born male without knowing her personal details

or her sharing that information.

29.

During times relevant to this Complaint between 2020 and 2023, Ms. Imura did

not disclose the private fact of her trans status to any Delta employee, co-worker, IFS

Charter program employee, or any member of the Tennessee Titans (including players,

coaches or staff), until after she filed a complaint with Delta on July 10, 2023 alleging

*inter alia* discrimination and harassment based on her being a trans female.

30.

Ms. Imura's problems started when she joined the Delta IFS Charter Program,

specifically serving the Tennessee Titans in 2020.

13

Delta's Charter Flight Program

31.

On information and belief, in addition to its regular customer flight operations, Delta also has a separate flight operations program to service charter flights.

32.

On information and belief, In-Flight Service Charter Programs (hereinafter " IFS Charters" of "IFS Charter Program") is a specialty department within Delta that staffs and services all the charter clients, including but not limited to professional sports teams.

33.

On information and belief flight attendants must meet specific criteria to apply for consideration for being hired into the IFS Charter program, which hiring is by separate contract with the IFS Charter program.

34.

On information and belief flight attendants apply for, are interviewed, and only after being accepted, can serve as IFS Charter flight attendants.

35.

On information and belief, the IFS Charter program is subject to its own code of conduct which recognizes the celebrity nature of the charter clients.

14

36.

On information and belief, acceptance into the IFS Charter program and serving as an IFS Charter Flight Attendant is specially regarded as a career plumb, and significant career advancement position, which Delta itself recognizes. Accordingly, Delta's Code of Conduct for the IFS Charter Program specifically "congratulates" flight attendants who are "selected to be a dedicated charter flight attendant," which position Delta states is one that "many aspire to have."

37.

On information and belief, when a New Charter client submits an Interest to Delta's IFS Charter Department, a determination is made about whether the client is looking for a dedicated flight attendant team to fly the chartered flights to the client.

38.

On information and belief, a charter client, along with Delta, determines the flight attendant staffing needs based on the size of the charter aircraft, so that a flight attendant roster is composed of Primary flight attendants (FA's) who commit to flying with the client, relevant here, the Tennessee Titans football team, to and from every game, including post season. The roster also includes Alternate FA's, who are

similarly committed to the team, but are substitutes for the Primary FA's when a Primary FA calls out.

39.

On information and belief, being a Primary FA guaranteed a work schedule to the Primary FA who knew in advance that he/she would fly every Titans game flight and also provided a guaranteed and predictable income to that flight attendant since he/she was scheduled to fly every flight with the team. In contrast, an Alternate FA might or might not be called to fly a particular flight depending on whether a primary and/or higher-ranking alternate was unavailable so the schedule was unpredictable. Alternate FA's were on call. FA's only get paid for flights they fly. On information and belief, Primary FA was/is regarded as a higher status than Alternate FA, with perks associated with always being with the team, and with both work and pay security as opposed to an Alternate FA.

40.

On information and belief in 2020 the Tennessee Titans NFL football team, based in Nashville, TN, were looking for a dedicated charter flight team from Delta's IFS Charter Department, to fly from Atlanta as the base.

41.

On information and belief, it was determined in 2020 that the Tennessee Titans required 6 Primary FA's and 9 Alternate FA's for a total of 15 dedicated FA's.

42.

On information and belief, in 2020 Delta's IFS Charter Program sent out emails (Employee of Interest forms) to qualified flight attendants to submit their interest to work the charter flights for the Tennessee Titans, after which qualified flight attendants were interviewed.

43.

Ms. Imura received an Employee of Interest Form in 2020 to serve as part of the flight attendant crew for the Tennessee Titans, was interviewed, and was selected to be part of the Tennessee Titans flight crew roster.

44.

On information and belief, after the interviews in 2020, the selected flight attendant candidates were ranked and assigned a rank number. On information and belief those flight attendants ranked 1-6 were "Primary" flight attendants whose role it was to fly every charter flight for the Tennessee Titans. On information and belief, those flight attendants ranked 7-15 were "Alternate" flight attendants, who would be contacted in rank order to fly a particular flight if one or more Primary flight

attendant could not fly a trip, or if any of the higher ranked flight attendants (Primary or Alternate) were unavailable.

45.

Ms. Imura was interviewed by Delta personnel and by Brent Akers, Vice President, Team Operations of the Tennessee Titans, and in 2020 when the Titans Team flight crew team roster was created, was hired as an Alternate FA in rank position number 9 for the 2020/2021 NFL season. This meant that there were 6 selected Primary Flight Attendants, and Ms. Imura was the third Alternate in rank order.

46.

Ms. Imura was an Alternate FA during the 2021/2022 and was promoted to Primary Flight Attendant for the 2022/2023 season in rank position number 6.

<u>Discrimination and Harassment Based on Plaintiff's Trans Status and her Asian race, ethnicity, ancestry and culture, started at the very beginning of Plaintiff's Assignment to Delta's Charter Operation serving the Tennessee Titans</u>

47.

On information and belief, at all relevant times, Defendant Amber Lauderdale, an African American female was ranked No. 1, was Primary FA, and considered FA team lead. She held the title A line/Flight Leader for the Titans IFS Charter.

18

This meant Ms. Lauderdale dealt with all alleged policy violations and any issues among flight attendants before they were escalated to Ms. Lauderdale's Field Service Manager at the Atlanta base. On information and belief Ms. Lauderdale took it upon herself to require the Titans flight attendants to call her if they could not work a scheduled trip, which schedule she would then manipulate, in violation of Delta policy, to prevent Ms. Imura from flying trips, and also, as described below, interceded to change the roster ranking in 2023 to demote Ms. Imura from Primary FA after Ms. Imura had been promoted to that position in 2022.

48.

Ms. Lauderdale repeatedly held herself out as "speaking for the team" and acting on behalf of Delta and for Delta's benefit.

49.

From the beginning, starting in 2020 Ms. Lauderdale and FA Ms. Hearon communicated their anti-trans bias.

50.

In 2020, during COVID, FA's on the Tennessee Titans flight wore face masks.

51.

On an early trip in the 2020 NFL season, Ms. Graeme Wagner, a Caucasian female Primary FA, was walking through the Atlanta airport with Ms. Lauderdale

19

and Ms. Hearon when Ms. Hearon stated regarding Ms. Imura, "I think that's a dude," and Ms. Lauderdale agreed, stating, look at his "knuckles and calves." Ms. Wagner who was present and overheard the conversation will testify that these remarks were made derisively and pejoratively. This was the beginning of Ms. Lauderdale's abuse, humiliation, isolation, and conduct aimed at getting rid of Ms. Imura, which desire Ms. Lauderdale stated openly, starting in 2020.

52.

On information and belief, Ms. Lauderdale told Ms. Wagner that Ms. Imura was trans after the second Tennessee Titans game of the 2020 season.

53.

Thereafter, consistently and repeatedly through and including July 2023, Ms. Lauderdale publicly disclosed that Ms. Imura is trans and repeatedly stated that she (Ms. Lauderdale) wanted Ms. Imura removed from the Titans' roster.

54.

Ms. Imura had never disclosed her transition or sexual orientation, or her trans status to Ms. Lauderdale or any other FA or to anyone on the Titans team.

55.

On information and belief, on repeated occasions, Ms. Lauderdale, referring to Ms. Imura, and ostensibly speaking for "the team" stated "I don't want that shit on

20

here." on at least one such occasion referencing "man hands."  On other occasions Ms. Lauderdale stated, referring to Ms. Imura, "they don't want that skirt and heels."

56.

Ms. Lauderdale repeatedly stated in front of other FA's that she wanted to get rid of Ms. Imura because she (Ms. Imura) was trans and because of her Asian race, ethnicity, culture and ancestry. Ms. Lauderdale repeatedly said that Ms. Imura "has got to go."

57.

On information and belief, Ms. Lauderdale also outed Ms. Imura as trans to the Titans team.  On information and belief, a Titans player said to Ms. Wagner, "I hear we have a trans flight attendant," which remark Ms. Wagner deflected.

58.

Graem Wagner was present in Green Bay, Wisconsin in November 2022, when Ms. Lauderdale, in front of a Tennessee Titans coach stated, "even he knows Shalani's trans."

59.

Denisa Hearon also expressed anti trans *animus* when she stated that she could not believe that Ms. Imura (as a trans person) had ranked higher than she did on the roster.

21

60.

Ms. Lauderdale also expressed *animus* towards Ms. Imura's Asian race, ethnicity, culture and ancestry. This occurred on repeated occasions when she (Ms. Lauderdale) humiliated and castigated Ms. Imura for wearing a flower in her hair which is part of her Asian ethnicity, race and culture, stated that Ms. Imura "stank," and that she had to move her stinky "Asian food." On information and belief other FA's witnessed these incidents and saw that Ms. Imura's response was deep humiliation and hurt.

61.

The first NFL year, 2020/2021, the flight attendants bought their own jerseys to wear. In following years, the Titans provided jerseys for the flight attendant crew which were distributed by Ms. Lauderdale. The flight attendants were supposed to wear matching jerseys in any given year, but Ms. Lauderdale refused to provide a Titan team jersey to Ms. Imura, so that Ms. Imura had to wear the jersey which she had purchased herself in the first year of the Titans charter season with Delta. This occurred even when Ms. Imura had been promoted to Primary FA in 2022/2023, so that by that time, Ms. Imura's initial, self-bought jersey was tattered. Ms. Imura was the only FA to whom new Titans jerseys were not distributed.

62.

In or about the 2022 season, Ms. Lauderdale deliberately excluded Ms. Imura from an event hosted by a Titans coach which was intended to include all of the flight attendants. This event was on a Titans trip to Green Bay. Ms. Lauderdale deliberately left Ms. Imura off the email thread so that she was the only FA not invited and not in attendance. Other FA's observed Ms. Imura's isolation and humiliation precipitated by Ms. Lauderdale's discriminatory bullying. On information and belief, FA's who observed Ms. Lauderdale's treatment of Ms. Imura have described it as "severe bullying" because of Ms. Imura being trans and of Asian race, ethnicity, culture and ancestry.

63.

Ms. Lauderdale's harassment of Ms. Imura occurred on every trip.

64.

Briefings for the flight crew were conducted before every flight. Ms. Lauderdale as the lead FA led and conducted these briefings. At every briefing she nitpicked Ms. Imura, singled her out, criticized her unfairly, and said to the entire flight attendant staff on the flight, every time either the exact words or words to the effect "You'all bear with me; it's not about you'all; its about Shalani" and then directed some negative comment toward Ms. Imura to humiliate her and single her

23

out. On information and belief, FA's present observed that Ms. Imura on these occasions looked "broken and humiliated, like she wanted to disappear." On information and belief, FA's' later corroborated to Delta investigators that Ms. Lauderdale's conduct was aimed at Ms. Imura because she is trans and Asian.

65.

One example of Ms. Lauderdale singling Ms. Imura out had to do with Ms. Imura wearing a flower in her hair, which is part of her Asian race, ethnicity and culture. This allegedly was a uniform violation, accordingly to Ms. Lauderdale, and Ms. Lauderdale took the opportunity to humiliate Ms. Imura by her public remarks and tone about the flower, in front of the Titans and other FA's. However, Mr. Bennett, another FA, regularly wore his mother's ashes around his neck, tennis shoes and black jeans instead of the required black pants, and required black shoes, without incurring any similar public humiliation as Ms. Lauderdale directed at Ms. Imura, or indeed with any comment at all by Ms. Lauderdale. Mr. Bennett wearing tennis shoes, black jeans, and his mother's ashes around his neck was in fact a uniform policy violation. Ms. Lauderdale's singling Ms. Imura out *inter alia* to humiliate her, was at the same time that Ms. Lauderdale deliberately withheld from Ms. Imura the uniform "Titans" jerseys that the flight attendants were provided by the Titans and

were supposed to wear so that the flight attendants appeared to be uniform in their

attire.

66.

During the period that Ms. Imura was Alternate FA before she was promoted

to Primary FA for the 2022/2023 NFL season, Ms. Lauderdale manipulated the

scheduling so that Ms. Imura could not fly trips, even as an Alternate when it would

have been her turn, based on rank number to fly the trip. This happened because Ms.

Lauderdale told flight attendants to call her if they could not fly a trip, instead of

contacting Charter POC, which was Delta's Charter policy. Delta's Charter policy

required charter FA's to contact Charter POC for approval to call out, and then

Charter POC would go down the "Alternate" list in seniority order to cover trips. Ms.

Imura is aware that if an FA contacted Ms. Lauderdale to call out, Ms. Lauderdale

would hold onto the trip, i.e. "park the trip" which is against Delta's policy, to ensure

that Ms. Imura did not get the trip and instead give trips to other FA's lower than Ms.

Imura in the roster rank.

67.

This conduct by Ms. Lauderdale happened repeatedly, numerous times

between 2020 and July 2023, when Ms. Lauderdale was instrumental in demoting

Ms. Imura, thus violating Ms. Imura's seniority on the alternate list, violating Delta's policy, and causing Ms. Imura loss of income.

68.

In or about June 2022, Ms. Imura was promoted to Primary FA, in the 6th position roster spot on the Titans 2022/2023 NFL year. On information and belief this was the only time a roster was changed, and on this occasion was changed because of illness and relocation of other Primary and higher ranked Alternate FA's so that Ms. Imura moved up into the 6th ranked spot as a Primary FA.

69.

The 2022/2023 roster had Ms. Imura ranked 6th, which was a Primary FA spot, and Denisa Hearon ranked 10th, as an Alternate.

70.

For the 2023/2024 Titans season, the team roster again came out with Ms. Imura as Primary FA, again in the 6th ranked spot, and Denisa Hearon again ranked 10th, as an Alternate. On or about June 29, 2023 Ms. Imura received an email from Delta IFS Charters with the 2023/2024 Titans team roster with Ms. Imura as Primary FA, in the 6th ranked spot.

71.

On or about July 10, 2023, Ms. Imura received another email from Delta IFS Charters informing her that IFS "received an updated roster ranking from the Tennessee Titans" now demoting Ms. Imura from Primary to Alternate FA, and ranking her 9th, behind Ms. Hearon, (who for that year initially had been ranked 10th but was moved to Ms. Imura's 6th place rank, replacing Ms. Imura as Primary FA, Erin Eby, who for that year initially had been ranked 9th but was moved to rank 7, and Meredith Davis, who for that year initially had been ranked 11th but was moved to rank 8.

72.

Starting on July 10, 2023, Ms. Imura challenged this unwarranted and arbitrary demotion as discriminatory based on her trans status and Asian race, ethnicity, culture and ancestry, and exchanged a series of emails with Delta IFS Charters challenging the demotion on those bases.

73.

IFS Charters responded to Ms. Imura that "we unfortunately received an updated roster from the Team" and that the "Tennessee Titans sent us the updated rankings, but didn't gave any reasons why any adjustments were made. . ." "(C)ontractually the customer isn't obligated to provide a reason."

27

74.

Delta told the EEOC that the Titans were responsible for the roster change, but this was not true as other flight attendants heard Ms. Lauderdale state to Brent Akers – who worked for the Titans – that they needed to rearrange the roster to get Ms. Imura out of the Primary FA position.

75.

On information and belief, Ms. Lauderdale had one or more conversations with Mr. Akers about changing the roster, Mr. Akers responded to Ms. Lauderdale "who do you want me to email" at IFS Charter Program,  and Ms. Lauderdale responded that she would get him an email address where he should send a revised roster.

76.

Ms. Imura was demoted from Primary FA to Alternate FA thereafter, and received notification of that demotion from Delta IFS Charter on July 10, 2023.

77.

On information and belief, other FA's observed that this demotion "crushed" Ms. Imura to the point that she became suicidal.

78.

Ms. Imura for the first time was put on anti-depressants by her doctor.  Ms. Imura had never previously taken medication for any mental condition.

79.

On or about July 10, 2023, Ms. Imura challenged the changed roster and thereafter filed an internal complaint on or about July 26, 2023. This internal complaint filed with Delta IFS alleged discrimination and harassment based on her trans status, her being Asian, and named Amber Lauderdale as the perpetrator of the discrimination and harassment.

80.

Ms. Imura exchanged emails regarding her complaint about discrimination with Heather Louviere, GM of IFS Strategic Programs, who acknowledged Ms. Imura's discrimination complaint on July 17, 2023 and told Ms. Imura that her complaint would be referred to the base, *i.e.* Atlanta International In-Flight Operations, for investigation and to "take appropriate action."

81.

Delta told the EEOC that it had conducted an investigation into Ms. Imura's allegations and found them to be unsubstantiated. But this was false.

82.

On information and belief, the alleged investigation was ultimately conducted by Shawn Manley, Sr. Base Manager, ATL- In-Flight Operations, and Kristan Darty, Delta Manager of Employee Relations.

83.

On information and belief, Ms. Darty stated to one or more witnesses that she was relatively new to doing investigations and/or did not have much experience.

84.

On information and belief, Delta did not in fact investigate Ms. Imura's allegations, because Ms. Darty redirected the investigation into one having to do with a black/white race issue, arising out of a conflict between Graeme Wagner and Amber Lauderdale, after Ms. Wagner came forward as a witness on behalf of Ms. Imura.

85.

On information and belief, in or about mid-August 2023, after Ms. Imura had submitted her discrimination complaint and a list of witnesses, including Ms. Wagner and Erin Eby, Amber Lauderdale verbally attacked both Ms. Wagner and Ms. Eby in a hotel lobby while on an away flight for the Titans, alleging falsely that Ms. Wagner had used the "N" word in 2022. On information and belief, Ms. Lauderdale

threatened and chased Ms. Wagner into the elevator, screaming at her. On

information and belief, Ms. Wagner tried to deflect Ms. Lauderdale, and told her that

she could arrange a separate time to speak about this alleged issue, since the flight

crew had just come off a 10-12 hour flight day. On information and belief, Ms.

Wagner was scared and did not sleep that night and thereafter filed her own

complaint against Ms. Lauderdale.

86.

On or about August 16, 2023, Ms. Imura also complained to Delta that Ms.

Lauderdale was retaliating against her witnesses, specifically raising Ms.

Lauderdale's verbal attack on Ms. Wagner and Ms. Eby at or about that time.

87.

On information and belief, Ms. Wagner had complained to Ms. Lauderdale and

another flight attendant, Charles Bennett, who is an African-American male, that the

Titans players would use the "N" word routinely to each other, and to the African-

American flight attendant crew, which made Ms. Wagner uncomfortable. On

information and belief, Ms. Wagner expressed her discomfort by using the words

"the N word", rather than the word "Nigger", which the Titans players used, Mr.

Bennet used and Ms. Lauderdale used. Ms. Wagner was present when Denisa Hearon

recounted to Ms. Wagner and Ms. Lauderdale that she had discovered that her great

31

grandfather was African-American, and Ms. Lauderdale responded, "now you can say Nigger without getting in trouble."

88.

On information and belief, when Mr. Manley and Ms. Darty were supposed to be investigating Ms. Imura's allegations, Ms. Darty (who is African American) took over the investigation and made it about (black/white) race.

89.

On or about September 13, 2023 Ms. Imura met with Mr. Manley and Ms. Darty, providing pages and pages of incidents about harassment, bullying and discriminatory treatment because of her being trans and Asian, and about retaliation.

90.

On information and belief, during October 2023, witnesses had spoken with Mr. Manley and Ms. Darty confirming Ms. Imura's allegations of discrimination and harassment because she is trans and Asian, and that Ms. Lauderdale denied Ms. Imura trips and was instrumental in causing her demotion from Primary flight attendant based on these illegal reasons. On information and belief, Mr. Manley believed these witnesses and that Ms. Imura's allegations were substantiated.

91.

On information and belief, Ms. Darty diverted the investigation away from

Ms. Imura's allegations, and never followed up on the allegations of trans abuse and

discrimination and harassment based on Ms. Imura's Asian race, ethnicity, culture

and ancestry and trans status.

92.

On information and belief, Mr. Manley's interview notes which content he

shared with Delta, reflect witness statements corroborating Ms. Imura's allegations

of trans and Asian discrimination, harassment and retaliation.

93.

Mr. Manley was fired in November 2023 allegedly for using the "N" word in

explaining the investigation that Ms. Darty was pursuing.

94.

During the ostensible investigation of Ms. Imura's complaint, it was revealed

that Mr. Bennett and Ms. Lauderdale, both of whom are African American, not only

said the words "the N word", but themselves used the word "Nigger", but suffered no

discipline, and that Ms. Lauderdale had misrepresented the events regarding Ms.

Wagner by presenting out of context Ms. Wagner's complaint to Ms. Lauderdale

about having to be around hearing the "N" word used by Titans players. Ms. Wagner is Caucasian.

95.

Mr. Manley is a Caucasian male.

96.

Delta's representation to the EEOC that the investigation failed to corroborate Ms. Imura's allegations was and is false.

97.

Mr. Manley told Ms. Imura that her case was "put under the table" and never followed up on.

98.

Instead of dealing with the problem of Ms. Lauderdale's illegal conduct, Delta dragged out the alleged investigation, even after witnesses had corroborated Ms. Imura's allegations, and continued to require Ms. Imura to fly flights with her abuser, Ms. Lauderdale. The abusive, discriminatory and hostile work environment only changed for Ms. Imura when she gave up the Charter Flight Attendant position with the Titans in Atlanta and moved to Las Vegas to accept a flight attendant position in Delta's regular flight operations. Flying as a flight attendant for Delta's regular flight operations was a backward career step for Ms. Imura.

34

99.

On information and belief, Ms. Lauderdale had been the subject of other employee complaints.

100.

Delta protected Ms. Lauderdale and fired Mr. Manley, the investigator who would verify that witnesses corroborated Ms. Imura's allegations, and that he believed them to be credible as opposed to Ms. Lauderdale. Indeed, Delta protected Ms. Lauderdale, who on information and belief continued to be lead FA for the Titans Charter until the Titans declined to renew its charter contract with Delta, and even though Ms. Lauderdale said the actual word "N" word on repeated occasions, which Ms. Darty stated was a terminable offense.

101.

Following her demotion, and her near suicidal response to the treatment she had suffered as a result of her being trans and Asian, Ms. Imura did not fly any further flights for the Titans charter and instead relocated to Las Vegas, Nevada to escape the intolerable hostile environment and discrimination that caused her to be put on anti-depressants.

102.

Ms. Imura has suffered and continues to suffer *inter alia* economic damages, mental anguish damages, and damages to her career and reputation.

103.

Ms. Imura has suffered and continues to suffer pecuniary loss as a result of Defendant Delta's aforesaid actions and failure to act.

104.

Ms. Imura suffered and continues to suffer mental and emotional distress as a result of the foregoing acts and failure to act by Defendant Delta, and as a result of the aforesaid actions of Ms. Lauderdale.

105.

Delta's actions were wanton and willful, done with malice, or at the least done with reckless or callous disregard of its own policies and of Ms. Imura's legal right to work in an environment free of discrimination and unrelenting harassment based on her being trans and of Asian, race, culture, ethnicity and ancestry, subjecting it to punitive damages. Delta's actions of in reality failing to investigate Ms. Imura's complaint of discrimination and harassment based on her being trans and Asian, in protecting Ms. Lauderdale, on information and belief a repeated harasser with discriminatory *animus*, and in firing Mr. Manley's who would have revealed that Ms.

Imura's allegations were substantiated, instead misrepresenting to the EEOC that it conducted an investigation when it did not, and that the allegations were unsubstantiated, when they were not, were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of Defendant Delta's failure to act.

106.

Defendant Lauderdale's actions in discriminating against and harassing Ms. Imura *inter alia* based on Ms. Imura being Asian were wanton, willful and constitute an entire want of care raising the presumption of indifference to the consequences of her actions.

107.

Defendant Lauderdale's actions in violating Ms. Imura's right to privacy by disclosing to other flight attendants, the Titans team, coaches and/or staff that Ms. Imura is trans was wanton, willful and constitutes an entire want of care raising the presumption of indifference to the consequences of her actions subjecting her to punitive damages against her under Georgia law.

<u>FIRST CAUSE OF ACTION</u>
<u>SEXUAL HARASSMENT</u>
<u>(TITLE VII OF THE 1964 CIVIL RIGHTS ACT,</u>
<u>42 U.S.C.§2000e *et seq.* -</u>
<u>against Delta)</u>

108.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully herein.

109.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), the nature of the action (¶¶1, 17), and satisfaction of conditions precedent (¶¶18-24).

110.

In particular, Ms. Imura realleges ¶¶1, 2-4, 17, 28, 29 which set forth that she is a male to female transgender person and therefore in a protected class.

111.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 49, 51-55, 57-59, 61-64, 66-76, 89-90, 92, 98 establishing that Defendant Amber Lauderdale was motivated by illegal anti-trans *animus*.

112.

Ms. Imura realleges the allegations contained in ¶¶ 1, 17, 49-59, 61-77 establishing that she was subjected to a hostile work environment that was severe or pervasive based on her gender identity, sexual orientation and trans status. Day in and day out, on every flight that Ms. Imura flew with Ms. Lauderdale, at every briefing in front of the FA's, Ms. Lauderdale singled out Ms. Imura for public humiliation, for fabricated problems, for violating ostensible protocols that other FA'S' violated with impunity, by denying her the required Titans jersey, by excluding Ms. Imura alone from Titan events meant to include all FA's, by outing her trans status and making derogatory and insulting remarks about Ms. Imura being trans, by parking flights so that Ms. Imura would be prevented from taking trips to which she would be entitled by ranking and seniority as an Alternate FA, by stating that she wanted Ms. Imura off the Titans FA team roster because of her being trans, and by causing her demotion from Primary to Alternate FA in the 2023/2024 Titans NFL season roster, after Ms. Imura had already been ranked 6th for that year, and was a Primary FA because Ms. Imura is trans.

113.

This conduct by Ms. Lauderdale amounts to harassment based on sexual orientation and gender identity in violation Title VII sufficient to rise to the level of objective sexual harassment under the law.

114.

Ms. Imura realleges ¶¶ 1, 17, 63, 64, 77-80, 89-90, 98, 101-102 and 104 establishing that Ms. Imura subjectively perceived her working environment to be hostile based on her status as a trans person.

115.

The harassment directed at Ms. Imura because of her being trans was severe or pervasive so as to alter the terms and conditions of her employment, rising to the level of actionable sexual harassment under the law.

116.

Witnesses provided statements to Delta confirming the day in and day out harassing treatment and severe bullying of Ms. Imura by Ms. Lauderdale because of Ms. Imura being trans and that Ms. Imura subjectively perceived her environment to be hostile, describing her as humiliated, appearing as though she wanted to disappear, and being suicidal after Ms. Lauderdale precipitated and caused her demotion from Primary FA on the Titans charter roster.

40

117.

Ms. Imura alleges that a reasonable trans woman in her position would objectively construe the work environment at Delta to be permeated with sexual hostility and anti-trans animus, and that she was objectively subjected to unwelcome harassment because of her sexual orientation, gender identity and status as a trans individual.

118.

Ms. Imura complained to Delta about the aforementioned harassment based on her being trans.

119.

Despite its pretense at an investigation, Delta never really investigated Ms. Imura's allegations based on harassment because she is trans, and rather, as Mr. Manley told Ms. Imura put her investigation under the table.

120.

To the extent that Mr. Manley and Ms. Darty conducted interviews, as of October 2023, witnesses had corroborated Ms. Imura's allegations of harassment by Mss. Lauderdale because Ms. Imura is transgender.

121.

Delta misleadingly told Ms. Imura and the EEOC that its investigation did not corroborate her allegations, but this was false.

122.

Delta took no steps to prevent or correct the anti-trans harassment by Ms. Lauderdale of Ms. Imura, even after witnesses had corroborated it, requiring Ms. Imura to continue to fly flights with her harasser, until such time as Ms. Imura left Delta's charter operations program, discontinued flying with the Titans, and took a backward career step moving to Las Vegas and flying as a flight attendant in Delta's regular flight program.

123.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating that she has suffered economic and non-economic damages arising out of harassment of her because of her gender identity, sexual orientation and trans status. Ms. Imura has suffered mental, emotional and economic damages as a result of Delta's aforesaid unlawful actions, as well as injury to reputation and pecuniary loss which is continuing, and will continue into the future.

124.

Delta's actions were wanton and willful, done with malice, or at the least done with reckless or callous disregard of its own policies and Ms. Imura's legal right to work in an environment free of unrelenting harassment because of her gender identity, sexual orientation and trans status, subjecting it to punitive damages. and retaliation, subjecting it to punitive damages. Delta's actions in putting Ms. Imura's allegations "under the table", disregarding the witness corroboration of Ms. Imura's allegations, misrepresenting that the "investigation" failed to corroborate Ms. Imura's allegations, forcing her to continue to work with her harasser until she left the Titans' Charter roster (as Ms. Lauderdale wanted and intended), were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of Defendant's failure to act.

<u>SECOND CAUSE OF ACTION</u>
<u>SEX DISCRIMINATION</u>
<u>(TITLE VII OF THE 1964 CIVIL RIGHTS ACT,</u>
<u>42 U.S.C.§2000e *et seq.*-</u>
<u>against Delta)</u>

125.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully herein.

126.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), the nature of the action (¶¶1, 17), and satisfaction of conditions precedent (¶¶18-24).

127.

In particular, Ms. Imura realleges (¶¶1, 2-4, 17, 28, 29 ) which set forth that she is a male to female transgender person and therefore in a protected class.

128.

Ms. Imura realleges ¶¶ 34-36, 42-46, 68-70 establishing that she was qualified to be an Alternate and then Primary flight attendant in Delta's IFS Charter Program for the Tennessee Titans team.

129.

During the period that Ms. Imura was an Alternate flight attendant on the Titans' charter roster she was qualified for that position, indeed having a higher ranking than at least 6 other flight attendants on the Titans flight attendant roster.

130.

Ms. Imura was qualified to be a Primary FA in 2022 when she was moved into the 6th place rank, as roster numbers 1-6 were Primary FA positions.

131.

Ms. Imura was qualified to be a Primary FA in 2023 when she was in the 6th place rank, as roster numbers 1-6 were Primary FA positions.

132.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 49, 51-55, 57-59, 61-64, 66-76, 89-90, 92, 98 establishing that Defendant Amber Lauderdale was motivated by illegal anti-trans animus.

133.

Ms. Imura was subjected to different terms and conditions of employment which amount to unlawful discrimination based on her gender identity, sexual orientation and trans status, which was at least a motivating factor, including *inter alia*:

1) being subjected to hostile work environment motivated by anti -trans *animus*, which itself affected the terms and conditions of her employment;

2) being denied flights as an Alternate FA, because Ms. Lauderdale "parked the flights" to avoid having Ms. Imura fly those trips,

3) being demoted from Primary to Alternate FA for the 2023-2024 Titans NFL season, after having been continued in the Primary FA position,

following Ms. Lauderdale's statement to the Titans that the roster had to be changed to remove Ms. Imura from that position;

4) being lowered in the Alternate rankings after that demotion so that she was now not even the first Alternate (No. 7), and all of the individuals ahead of whom where Ms. Imura had been, were now re-ranked ahead of her, making it more difficult for Ms. Imura to get Titans charter trips, even as an Alternate.

134.

Ms. Imura realleges the allegations in her First Cause of Action based on a hostile work environment because of Ms. Imura's gender identity, sexual orientation and status as a trans person, since such a hostile environment is tantamount to subjecting Ms. Imura to different terms and conditions of employment based on an illegal discriminatory motive.

135.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 49-55, 57-59, 66-67 establishing that Ms. Lauderdale's conduct in manipulating the schedule to preclude Ms. Imura from being called to fly trips when Ms. Imura was an Alternate on the Titans roster was illegal discrimination based on Ms. Imura's status as a trans person, and in fact injured her financially by denying her the ability to fly trips that she was

entitled to and should have been able to fly based on the applicable seniority and ranking policies of the IFS Charter Program.

136.

Ms. Imura realleges the allegations contain in ¶¶1, 17, 49-55, 57-59, 68-77 establishing that Ms. Lauderdale's conduct in precipitating Ms. Imura's demotion from Primary to Alternate flight attendant for the 2023-2024 Titans NFL season illegally subjected Ms. Imura to different terms and conditions of employment based on her status as a trans person, in fact injured her financially, and amounts to an adverse employment action.

137.

Delta  purportedly had a policy against harassment and discrimination based on gender orientation and status, but despite its awareness of Ms. Imura's complaint on this basis, Delta never really investigated her claims thoroughly, and instead derailed the "investigation" into one about race concerning one of Ms. Imura's witnesses. Delta was aware that witnesses had come forward corroborating Ms. Imura's allegations, and terminated Shawn Manley whose notes reflected this, and who would have concluded that Ms. Lauderdale was not credible. Mr. Manley told Ms. Imura that Delta put her investigation "under the table."

138.

Delta's own documents, including its letter to Ms. Imura regarding the
Titans' ostensibly making the decision to re-order the 2023/2024 roster and its
written statement to the EEOC,  reflect that it cannot articulate a reason for Ms.
Imura's demotion from Primary to Alternate for the 2023/2024 season, because
according to Delta, the Titans did not provide or have to provide a reason.

139.

In addition, Ms. Wagner heard Ms. Lauderdale directing Brent Akers Sr. VP
of the Titans Team Operations to change the 2023/2024 roster to get Ms. Imura
out of the Primary FA position, that Mr. Akers asked Ms. Wagner whom he would
need to email at the IFS charter program to do this, and Ms. Lauderdale respond
that she would provide him the email to send the changed roster to. Accordingly,
even if Delta can be deemed to be able to articulate a reason for the post initial
2023/2024 roster demotion of Ms. Imura, any reason would be pretextual to
conceal that the Titans acted at the behest of Ms. Lauderdale who repeatedly
stated her intent to get Ms. Imura out because of her trans status.

140.

The aforementioned conduct occurred because of Ms. Imura's gender identity, sexual orientation, and transgender status, which was at least a motivating factor in that conduct.

141.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating that she has suffered economic and non-economic damages arising out of harassment of her because of her gender identity, sexual orientation and trans status. Ms. Imura has suffered mental, emotional and economic damages as a result of Delta's aforesaid unlawful actions, as well as injury to reputation and pecuniary loss which is continuing, and will continue into the future.

142.

Delta's  actions were wanton and willful, done with malice, or at the least done with reckless or callous disregard of its own policies and Ms. Imura's  legal right to work in an environment free of unrelenting harassment because of her gender identity, sexual orientation and trans status, subjecting it to punitive damages. and retaliation,  subjecting it to punitive damages. Delta's actions in putting Ms. Imura's allegations "under the table", disregarding the witness corroboration of Ms. Imura's allegations, misrepresenting that the "investigation" failed to corroborate Ms.

Imura's allegations, forcing her to continue to work with her harasser until she left the Titans' Charter roster (as Ms. Lauderdale wanted and intended), were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of Defendant's failure to act.

<u>THIRD CAUSE OF ACTION</u>
<u>HARASSMENT BASED ON RACE, ETHNICITY, CULTURE</u>
<u>AND ANCESTRY (TITLE VII OF THE 1964 CIVIL RIGHTS ACT,</u>
<u>42 U.S.C.§2000e *et seq*. – against Delta)</u>

143.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully herein.

144.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), the nature of the action (¶¶1, 17), and satisfaction of conditions precedent (¶¶18-24).

145.

In particular, Ms. Imura realleges ¶¶1, 5, 17 which set forth that she is a Hawaiian Asian of Asian race, ethnicity, culture and ancestry and therefore in a protected class.

146.

Ms. Imura realleges ¶¶ 1, 5, 17, 60-77 which set forth that Ms. Lauderdale harbored an anti-Asian bias, and subjected Ms. Imura to a hostile work environment that was severe or pervasive, because of that anti-Asian bias.

147.

Ms. Imura realleges the allegations contained in ¶¶ 1, 5, 17, 60-77, 89-90 establishing that she was subjected to a hostile work environment that was severe or pervasive based on her Asian race, ethnicity, culture and ancestry. Day in and day out, on every flight that Ms. Imura flew with Ms. Lauderdale, at every briefing in front of the FA's, Ms. Lauderdale singled out Ms. Imura for public humiliation, for fabricated problems, for violating ostensible protocols that other FA'S' violated with impunity, by denying her the required Titans jersey, by excluding Ms. Imura alone from Titan events meant to include all FA's, by making derogatory and insulting remarks about being stinky, by forcing her to move her "stinky Asian food", by parking flights so that Ms. Imura would be prevented from taking trips to which she would be entitled by ranking and seniority as an Alternate FA, by stating that she wanted Ms. Imura off the Titans FA team roster and by causing her demotion from Primary to Alternate FA in the 2023/2024 Titans NFL season roster, after Ms. Imura had already been ranked 6th for that year, and was a Primary FA.

148.

This conduct by Ms. Lauderdale amounts to harassment of Ms. Imura based on her Asian race, ethnicity, culture and ancestry sufficient to rise to the level of objective illegal harassment under the law.

149.

Ms. Imura realleges ¶¶ 1, 17, 63, 64, 77-80, 89, 98, 101-102 and 104 establishing that Ms. Imura subjectively perceived her working environment to be hostile based on her Asian race, ethnicity, culture and ancestry.

150.

The harassment directed at Ms. Imura because of her Asian race, ethnicity, culture and ancestry was severe or pervasive so as to alter the terms and conditions of her employment, rising to the level of actionable illegal harassment under the law.

151.

Witnesses provided statements to Delta confirming the day in and day out harassing treatment and severe bullying of Ms. Imura by Ms. Lauderdale because of Ms. Imura's Asian race, ethnicity, culture and ancestry and that Ms. Imura subjectively perceived her environment to be hostile, describing her as humiliated, appearing as though she wanted to disappear, and being suicidal after Ms. Lauderdale precipitated and caused her demotion from Primary FA on the Titans charter roster.

152.

Ms. Imura alleges that an Asian woman in her position would objectively construe the work environment at Delta to be permeated with hostility based on her Asian race, ethnicity, culture and ancestry and that she was objectively subjected to unwelcome harassment because of this.

153.

Ms. Imura complained to Delta about the aforementioned harassment based on her Asian race, ethnicity, culture and ancestry.

154.

Ms. Imura was harassed and singled out by Ms. Lauderdale and Delta as a non-African American person in the Atlanta market, which favored African-American employees over those who were not African-American, for example by derailing Ms. Imura's investigation into one involving a black/non-black racial issue, by allowing African-Americans to use the "N" word, including the full "N" word with impunity, and penalizing and indeed firing, non-African Americans for allegedly using the "N" word, when such use was clearly out of context. Accordingly, Ms. Imura was subjected to "reverse" discrimination and harassment by Delta since it favored Ms. Lauderdale who is African-American despite witness statements against her, other complaints against her, Ms. Lauderdale fabricating a

"racial" incident, Mr. Manley believing witnesses over Ms. Lauderdale, and Delta firing Mr. Manley for fabricated reasons instead of dealing with Ms. Lauderdale.

155.

Despite its pretense at an investigation, Delta never really investigated Ms. Imura's allegations based on harassment because of her Asian race, ethnicity, culture and ancestry, and rather, as Mr. Manley told Ms. Imura put her investigation under the table instead investigating Ms. Imura's witness, Graeme Wagner based on an fabricated allegation of racism by Ms. Lauderdale.

156.

To the extent that Mr. Manley and Ms. Darty conducted interviews, as of October 2023, witnesses had corroborated Ms. Imura's allegations of harassment by Mss. Lauderdale because of Ms. Imura's Asian race, ethnicity, culture and ancestry.

157.

Delta misleadingly told Ms. Imura and the EEOC that its investigation did not corroborate her allegations, but this was false.

158.

Delta took no steps to prevent or correct the harassment by Ms. Lauderdale of Ms. Imura, even after witnesses had corroborated it, requiring Ms. Imura to continue to fly flights with her harasser, until such time as Ms. Imura left Delta's charter

operations program, discontinued flying with the Titans, and took a backward career step moving to Las Vegas and flying as a flight attendant in Delta's regular flight program.

159.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating that she has suffered economic and non-economic damages arising out of harassment of her because of her Asian race, ethnicity, culture and ancestry. Ms. Imura has suffered mental, emotional and economic damages as a result of Delta's aforesaid unlawful actions, as well as injury to reputation and pecuniary loss which is continuing, and will continue into the future.

160.

Delta's actions were wanton and willful, done with malice, or at the least done with reckless or callous disregard of its own policies and Ms. Imura's legal right to work in an environment free of unrelenting harassment because of her Asian race, ethnicity, culture and ancestry, subjecting it to punitive damages. and retaliation, subjecting it to punitive damages. Delta's actions in putting Ms. Imura's allegations "under the table", disregarding the witness corroboration of Ms. Imura's allegations, misrepresenting that the "investigation" failed to corroborate Ms. Imura's allegations, forcing her to continue to work with her harasser until she left the Titans'

55

Charter roster (as Ms. Lauderdale wanted and intended), were wanton, willful, and

constitute an entire want of care which raise the presumption of a conscious

indifference to the consequences of Defendant's failure to act.

<u>FOURTH CAUSE OF ACTION</u>
<u>DISCRIMINATION BASED ON RACE, ETHNICITY,</u>
<u>CULTURE AND ANCESTRY</u>
<u>(TITLE VII OF THE 1964 CIVIL RIGHTS ACT,</u>
<u>42 U.S.C.§2000e *et seq*. – against Delta)</u>

161.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully

herein.

162.

In particular, Ms. Imura realleges the allegations contained in regarding the

regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), the nature of the

action (¶¶1, 17), and satisfaction of conditions precedent (¶¶18-24).

163.

In particular, Ms. Imura realleges ¶¶1, 5, 17 which set forth that she is a

Hawaiian Asian of Asian race, ethnicity, culture and ancestry and therefore in a

protected class.

164.

Ms. Imura realleges ¶¶ 34-36, 42-46, 68-70 establishing that she was qualified to be an Alternate and then Primary flight attendant in Delta's IFS Charter Program for the Tennessee Titans team.

165.

During the period that Ms. Imura was an Alternate flight attendant on the Titans' charter roster she was qualified for that position, indeed having a higher ranking than at least 6 other flight attendants on the Titans flight attendant roster.

166.

Ms. Imura was qualified to be a Primary FA in 2022 when she was moved into the 6th place rank, as roster numbers 1-6 were Primary FA positions.

167.

Ms. Imura was qualified to be a Primary FA in 2023 when she was in the 6th place rank, as roster numbers 1-6 were Primary FA positions.

168.

Ms. Imura realleges ¶¶ 1, 5, 17, 60-77 which set forth that Ms. Lauderdale harbored an anti-Asian bias, and subjected Ms. Imura to a hostile work environment that was severe or pervasive, because of that anti-Asian bias.

169.

Ms. Imura was subjected to different terms and conditions of employment

which amount to unlawful discrimination based on her Asian race, ethnicity,

culture and ancestry which was at least a motivating factor, including *inter alia*:

1) being subjected to hostile work environment motivated by anti-trans

*animus*, which itself affected the terms and  conditions of her employment;

2) being denied flights as an Alternate FA, because Ms. Lauderdale

"parked the flights" to avoid having Ms. Imura fly those trips;

3) being demoted from Primary to Alternate FA for the 2023-2024 Titans

NFL season, after having been continued in the Primary FA position, following

Ms. Lauderdale's statement to the Titans that the roster had to be changed to

remove Ms. Imura from that position; and

4) being lowered in the Alternate rankings after that demotion so that she

was now not even first Alternate (No. 7), and all of the individuals ahead of

whom where Ms. Imura had been, were now re-ranked ahead of her, making it

more difficult for Ms. Imura to get Titans charter trips, even as an Alternate.

170.

Ms. Imura realleges the allegations in her Third Cause of Action based on a

hostile work environment because of Ms. Imura's Asian race, ethnicity, culture and

ancestry since such a hostile environment is tantamount to subjecting Ms. Imura to different terms and conditions of employment based on an illegal discriminatory motive.

171.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 60-77 establishing that Ms. Lauderdale's conduct in manipulating the schedule to preclude Ms. Imura from being called to fly trips when Ms. Imura was an Alternate on the Titans roster was illegal discrimination based on Ms. Imura's Asian race, ethnicity, culture and ancestry and in fact injured her financially by denying her the ability to fly trips that she was entitled to and should have been able to fly based on the applicable seniority and ranking policies of the IFS Charter Program.

172.

Ms. Imura realleges the allegations contain in ¶¶1, 17, 60-77 establishing that Ms. Lauderdale's conduct in precipitating Ms. Imura's demotion from Primary to Alternate flight attendant for the 2023-2024 Titans NFL season illegally subjected Ms. Imura to different terms and conditions of employment based on her Asian race, ethnicity, culture and ancestry in fact injured her financially, and amounts to an adverse employment action.

173.

Ms. Imura was harassed, singled out and discriminated against by Ms.

Lauderdale and Delta as a non-African American person in the Atlanta market,

which favored African-American employees over those who were not African-

American, for example by derailing Ms. Imura's investigation into one involving a

black/non-black racial issue, by allowing African-Americans to use the "N" word,

including the full "N" word with impunity, and penalizing and indeed firing, non-

African Americans for allegedly using the "N" word, when such use was clearly out

of context. Accordingly, Ms. Imura was subjected to "reverse" discrimination and

harassment by Delta since it favored Ms. Lauderdale who is African-American

despite witness statements against her, other complaints against her, Ms. Lauderdale

fabricating a "racial" incident, Mr. Manley believing witnesses over Ms. Lauderdale,

and Delta firing Mr. Manley for fabricated reasons instead of dealing with Ms.

Lauderdale.

174.

Delta  purportedly had a policy against harassment and discrimination

based on race, ethnicity, culture and ancestry, but despite its awareness of Ms.

Imura's complaint on this basis, Delta never really investigated her claims

thoroughly, and instead derailed the "investigation" into one about race (involving

African -American – white) concerning one of Ms. Imura's witnesses. Delta was aware that witnesses had come forward corroborating Ms. Imura's allegations, and terminated Shawn Manley whose notes reflected this, and who would have concluded that Ms. Lauderdale was not credible. Mr. Manley told Ms. Imura that Delta put her investigation "under the table."

175.

Delta's own documents, including its letter to Ms. Imura regarding the Titans' ostensibly making the decision to re-order the 2023/2024 roster and its written statement to the EEOC,  reflect that it cannot articulate a reason for Ms. Imura's demotion from Primary to Alternate for the 2023/2024 season, because according to Delta, the Titans did not provide or have to provide a reason.

176.

In addition, Ms. Wagner heard Ms. Lauderdale directing Brent Akers Sr. VP of the Titans Team Operations to change the 2023/2024 roster to get Ms. Imura out of the Primary FA position, that Mr. Akers asked Ms. Wagner whom he would need to email at the IFS charter program to do this, and Ms. Lauderdale respond that she would provide him the email to send the changed roster to. Accordingly, even if Delta can be deemed to be able to articulate a reason for the post initial 2023/2024 roster demotion of Ms. Imura, any reason would be pretextual to

61

conceal that the Titans acted at the behest of Ms. Lauderdale who repeatedly

stated her intent to get Ms. Imura of the Titans charter roster.

177.

The aforementioned conduct occurred because of Ms. Imura's Asian race,

ethnicity, culture and ancestry, which was at least a motivating factor in that

conduct.

178.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating

that she has suffered economic and non-economic damages arising out of harassment

of her because of her Asian race, ethnicity, culture and ancestry. Ms. Imura has

suffered mental, emotional and economic damages as a result of Delta's aforesaid

unlawful actions, as well as injury to reputation and pecuniary loss which is

continuing, and will continue into the future.

179.

Delta's  actions were wanton and willful, done with malice, or at the least done

with reckless or callous disregard of its own policies and Ms. Imura's  legal right to

work in an environment free of unrelenting harassment and discrimination because of

her Asian race, ethnicity, culture and ancestry, subjecting it to punitive damages. and

retaliation,  subjecting it to punitive damages. Delta's actions in putting Ms. Imura's

allegations "under the table", disregarding the witness corroboration of Ms. Imura's allegations, misrepresenting that the "investigation" failed to corroborate Ms. Imura's allegations, forcing her to continue to work with her harasser until she left the Titans' Charter roster (as Ms. Lauderdale wanted and intended), were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of Defendant's failure to act.

FIFTH CAUSE OF ACTION
HARASSMENT BASED ON RACE, ETHNICITY,
CULTURE AND ANCESTRY
(42 U.S.C. §1981 – against Delta)

180.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully herein.

181.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), and the nature of the action (¶¶1, 17).

182.

In particular, Ms. Imura realleges ¶¶1, 5, 17 which set forth that she is a Hawaiian Asian of Asian race, ethnicity, culture and ancestry and therefore in a protected class.

63

183.

Ms. Imura realleges ¶¶ 1, 5, 17, 60-77 which set forth that Ms. Lauderdale harbored an anti-Asian bias, and subjected Ms. Imura to a hostile work environment that was severe or pervasive, because of that anti-Asian bias.

184.

Ms. Imura realleges the allegations contained in ¶¶ 1, 5, 17, 60-77, 89-90 establishing that she was subjected to a hostile work environment that was severe or pervasive based on her Asian race, ethnicity, culture and ancestry. Day in and day out, on every flight that Ms. Imura flew with Ms. Lauderdale, at every briefing in front of the FA's, Ms. Lauderdale singled out Ms. Imura for public humiliation, for fabricated problems, for violating ostensible protocols that other FA's violated with impunity, by denying her the required Titans jersey, by excluding Ms. Imura alone from Titan events meant to include all FA's, by making derogatory and insulting remarks about being stinky, by forcing her to move her "stinky Asian food", by parking flights so that Ms. Imura would be prevented from taking trips to which she would be entitled by ranking and seniority as an Alternate FA, by stating that she wanted Ms. Imura off the Titans FA team roster and by causing her demotion from Primary to Alternate FA in the 2023/2024 Titans NFL season roster, after Ms. Imura had already been ranked 6th for that year, and was a Primary FA.

64

185.

This conduct by Ms. Lauderdale amounts to harassment of Ms. Imura based on her Asian race, ethnicity, culture and ancestry sufficient to rise to the level of objective sexual harassment under the law.

186.

Ms. Imura realleges ¶¶ 1, 17, 63, 64, 77-80, 89, 98, 101-102 and 104 establishing that Ms. Imura subjectively perceived her working environment to be hostile based on her Asian race, ethnicity, culture and ancestry.

187.

The harassment directed at Ms. Imura because of her Asian race, ethnicity, culture and ancestry was severe or pervasive so as to alter the terms and conditions of her employment, rising to the level of actionable harassment under the law.

188.

Witnesses provided statements to Delta confirming the day in and day out harassing treatment and severe bullying of Ms. Imura by Ms. Lauderdale because of Ms. Imura's Asian race, ethnicity, culture and ancestry and that Ms. Imura subjectively perceived her environment to be hostile, describing her as humiliated, appearing as though she wanted to disappear, and being suicidal after Ms. Lauderdale precipitated and caused her demotion from Primary FA on the Titans charter roster.

189.

Ms. Imura alleges that an Asian woman in her position would objectively

construe the work environment at Delta to be permeated with sexual hostility and

anti-trans animus,  and that she was objectively subjected to unwelcome harassment

because of her sexual orientation, gender identity and status as a trans individual.

190.

Ms. Imura complained to Delta about the aforementioned harassment based on

her Asian race, ethnicity, culture and ancestry.

191.

Ms. Imura was harassed and singled out by Ms. Lauderdale and Delta as a

non-African American person in the Atlanta market, which favored African-

American employees over those who were not African-American, for example by

derailing Ms. Imura's investigation into one involving a black/non-black racial issue,

by allowing African-Americans to use the "N" word, including the full "N" word

with impunity, and penalizing and indeed firing, non-African Americans for

allegedly using the "N" word, when such use was clearly out of context.

Accordingly, Ms. Imura was subjected to "reverse" discrimination and harassment by

Delta since it favored Ms. Lauderdale who is African-American despite witness

statements against her, other complaints against her, Ms. Lauderdale fabricating a

"racial" incident, Mr. Manley believing witnesses over Ms. Lauderdale, and Delta firing Mr. Manley for fabricated reasons instead of dealing with Ms. Lauderdale.

192.

Despite its pretense at an investigation, Delta never really investigated Ms. Imura's allegations based on harassment because of her Asian race, ethnicity, culture and ancestry, and rather, as Mr. Manley told Ms. Imura put her investigation under the table instead investigating Ms. Imura's witness, Graeme Wagner based on a fabricated allegation of racism by Ms. Lauderdale.

193.

To the extent that Mr. Manley and Ms. Darty conducted interviews, as of October 2023, witnesses had corroborated Ms. Imura's allegations of harassment by Mss. Lauderdale because of Ms. Imura's Asian race, ethnicity, culture and ancestry.

194.

Delta misleadingly told Ms. Imura and the EEOC that its investigation did not corroborate her allegations, but this was false.

195.

Delta took no steps to prevent or correct the harassment by Ms. Lauderdale of Ms. Imura, even after witnesses had corroborated it, requiring Ms. Imura to continue to fly flights with her harasser, until such time as Ms. Imura left Delta's charter

operations program, discontinued flying with the Titans, and took a backward career

step moving to Las Vegas and flying as a flight attendant in Delta's regular flight

program.

196.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating

that she has suffered economic and non-economic damages arising out of harassment

of her because of her Asian race, ethnicity, culture and ancestry. Ms. Imura has

suffered mental, emotional and economic damages as a result of Delta's aforesaid

unlawful actions, as well as injury to reputation and pecuniary loss which is

continuing, and will continue into the future.

197.

Delta's  actions were wanton and willful, done with malice, or at the least done

with reckless or callous disregard of its own policies and Ms. Imura's  legal right to

work in an environment free of unrelenting harassment because of her Asian race,

ethnicity, culture and ancestry, subjecting it to punitive damages. and retaliation,

subjecting it to punitive damages. Delta's actions in putting Ms. Imura's allegations

"under the table", disregarding the witness corroboration of Ms. Imura's allegations,

misrepresenting that the "investigation" failed to corroborate Ms. Imura's

allegations, forcing her to continue to work with her harasser until she left the Titans'

68

Charter roster (as Ms. Lauderdale wanted and intended), were wanton, willful, and

constitute an entire want of care which raise the presumption of a conscious

indifference to the consequences of Defendant Delta's failure to act.

<u>SIXTH CAUSE OF ACTION</u>
<u>DISCRIMINATION BASED ON RACE, ETHNICITY,</u>
<u>CULTURE AND ANCESTRY</u>
<u>(42 U.S.C. §1981 – against Delta)</u>

198.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully

herein.

199.

In particular, Ms. Imura realleges the allegations contained in regarding the

regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), and the nature of

the action (¶¶1, 17).

200.

In particular, Ms. Imura realleges ¶¶1, 5, 17 which set forth that she is a

Hawaiian Asian of Asian race, ethnicity, culture and ancestry and therefore in a

protected class.

201.

Ms. Imura realleges ¶¶ 34-36, 42-46, 68-70 establishing that she was qualified to be an Alternate and then Primary flight attendant in Delta's IFS Charter Program for the Tennessee Titans team.

202.

During the period that Ms. Imura was an Alternate flight attendant on the Titans' charter roster she was qualified for that position, indeed having a higher ranking than at least 6 other flight attendants on the Titans flight attendant roster.

203.

Ms. Imura was qualified to be a Primary FA in 2022 when she was moved into the 6th place rank, as roster numbers 1-6 were Primary FA positions.

204.

Ms. Imura was qualified to be a Primary FA in 2023 when she was in the 6th place rank, as roster numbers 1-6 were Primary FA positions.

205.

Ms. Imura realleges ¶¶ 1, 5, 17, 60-77 which set forth that Ms. Lauderdale harbored an anti-Asian bias, and subjected Ms. Imura to a hostile work environment that was severe or pervasive, because of that anti-Asian bias.

206.

Ms. Imura was subjected to different terms and conditions of employment which amount to unlawful discrimination based on her Asian race, ethnicity, culture and ancestry which was at least a motivating factor, including *inter alia*:

1) being subjected to hostile work environment motivated by anti-trans *animus*, which itself affected the terms and  conditions of her employment;

2) being denied flights as an Alternate FA, because Ms. Lauderdale "parked the flights" to avoid having Ms. Imura fly those trips;

3) being demoted from Primary to Alternate FA for the 2023-2024 Titans NFL season, after having been continued in the Primary FA position, following Ms. Lauderdale's statement to the Titans that the roster had to be changed to remove Ms. Imura from that position; and

4) being lowered in the Alternate rankings after that demotion so that she was now not even first Alternate (No. 7), and all of the individuals ahead of whom where Ms. Imura had been, were now re-ranked ahead of her, making it more difficult for Ms. Imura to get Titans charter trips, even as an Alternate.

207.

Ms. Imura realleges the allegations in her Third Cause of Action based on a hostile work environment because of Ms. Imura's Asian race, ethnicity, culture and

ancestry since such a hostile environment is tantamount to subjecting Ms. Imura to different terms and conditions of employment based on an illegal discriminatory motive.

208.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 60-77 establishing that Ms. Lauderdale's conduct in manipulating the schedule to preclude Ms. Imura from being called to fly trips when Ms. Imura was an Alternate on the Titans roster was illegal discrimination based on Ms. Imura's Asian race, ethnicity, culture and ancestry and in fact injured her financially by denying her the ability to fly trips that she was entitled to and should have been able to fly based on the applicable seniority and ranking policies of the IFS Charter Program.

209.

Ms. Imura realleges the allegations contain in ¶¶1, 17, 60-77 establishing that Ms. Lauderdale's conduct in precipitating Ms. Imura's demotion from Primary to Alternate flight attendant for the 2023-2024 Titans NFL season illegally subjected Ms. Imura to different terms and conditions of employment based on her Asian race, ethnicity, culture and ancestry in fact injured her financially, and amounts to an adverse employment action.

210.

Ms. Imura was harassed, singled out and discriminated against by Ms. Lauderdale and Delta as a non-African American person in the Atlanta market, which favored African-American employees over those who were not African-American, for example by derailing Ms. Imura's investigation into one involving a black/non-black racial issue, by allowing African-Americans to use the "N" word, including the full "N" word with impunity, and penalizing and indeed firing, non-African-Americans for allegedly using the "N" word, when such use was clearly out of context. Accordingly, Ms. Imura was subjected to "reverse" discrimination and harassment by Delta since it favored Ms. Lauderdale who is African-American despite witness statements against her, other complaints against her, Ms. Lauderdale fabricating a "racial" incident, Mr. Manley believing witnesses over Ms. Lauderdale, and Delta firing Mr. Manley for fabricated reasons instead of dealing with Ms. Lauderdale.

211.

Delta  purportedly had a policy against harassment and discrimination based on race, ethnicity, culture and ancestry, but despite its awareness of Ms. Imura's complaint on this basis, Delta never really investigated her claims thoroughly, and instead derailed the "investigation" into one about race (involving

African -American – white) concerning one of Ms. Imura's witnesses. Delta was aware that witnesses had come forward corroborating Ms. Imura's allegations, and terminated Shawn Manley whose notes reflected this, and who would have concluded that Ms. Lauderdale was not credible. Mr. Manley told Ms. Imura that Delta put her investigation "under the table."

212.

Delta's own documents, including its letter to Ms. Imura regarding the Titans' ostensibly making the decision to re-order the 2023/2024 roster and its written statement to the EEOC,  reflect that it cannot articulate a reason for Ms. Imura's demotion from Primary to Alternate for the 2023/2024 season, because according to Delta, the Titans did not provide or have to provide a reason.

213.

In addition, Ms. Wagner heard Ms. Lauderdale directing Brent Akers Sr. VP of the Titans Team Operations to change the 2023/2024 roster to get Ms. Imura out of the Primary FA position, that Mr. Akers asked Ms. Wagner whom he would need to email at the IFS charter program to do this, and Ms. Lauderdale respond that she would provide him the email to send the changed roster to. Accordingly, even if Delta can be deemed to be able to articulate a reason for the post initial 2023/2024 roster demotion of Ms. Imura, any reason would be pretextual to

conceal that the Titans acted at the behest of Ms. Lauderdale who repeatedly stated her intent to get Ms. Imura off the Titans flight attendant team roster.

214.

The aforementioned conduct occurred because of Ms. Imura's Asian race, ethnicity, culture and ancestry, which was at least a motivating factor in that conduct.

215.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating that she has suffered economic and non-economic damages arising out of harassment of her because of her Asian race, ethnicity, culture and ancestry. Ms. Imura has suffered mental, emotional and economic damages as a result of Delta's aforesaid unlawful actions, as well as injury to reputation and pecuniary loss which is continuing, and will continue into the future.

216.

Delta's  actions were wanton and willful, done with malice, or at the least done with reckless or callous disregard of its own policies and Ms. Imura's  legal right to work in an environment free of unrelenting harassment and discrimination because of her Asian race, ethnicity, culture and ancestry, subjecting it to punitive damages. and retaliation,  subjecting it to punitive damages. Delta's actions in putting Ms. Imura's

allegations "under the table", disregarding the witness corroboration of Ms. Imura's allegations, misrepresenting that the "investigation" failed to corroborate Ms. Imura's allegations, forcing her to continue to work with her harasser until she left the Titans' Charter roster (as Ms. Lauderdale wanted and intended), were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of Defendant Delta's failure to act.

SEVENTH CAUSE OF ACTION
HARASSMENT BASED ON RACE, ETHNICITY,
CULTURE AND ANCESTRY
(42 U.S.C. §1981 – against Amber Lauderdale)

217.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully herein.

218.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), and the nature of the action (¶¶1, 17).

219.

In particular, Ms. Imura realleges ¶¶1, 5, 17 which set forth that she is a Hawaiian Asian of Asian race, ethnicity, culture and ancestry and therefore in a protected class.

220.

Ms. Imura realleges ¶¶ 1, 5, 17, 60-77 which set forth that Ms. Lauderdale harbored an anti-Asian bias, and subjected Ms. Imura to a hostile work environment that was severe or pervasive, because of that anti-Asian bias.

221.

Ms. Imura realleges the allegations contained in ¶¶ 1, 5, 17, 60-77, 89-90 establishing that she was subjected to a hostile work environment that was severe or pervasive based on her Asian race, ethnicity, culture and ancestry. Day in and day out, on every flight that Ms. Imura flew with Ms. Lauderdale, at every briefing in front of the FA's, Ms. Lauderdale singled out Ms. Imura for public humiliation, for fabricated problems, for violating ostensible protocols that other FA's violated with impunity, by denying her the required Titans jersey, by excluding Ms. Imura alone from Titan events meant to include all FA's, by making derogatory and insulting remarks about being stinky, by forcing her to move her "stinky Asian food", by parking flights so that Ms. Imura would be prevented from taking trips to which she would be entitled by ranking and seniority as an Alternate FA, by stating that she wanted Ms. Imura off the Titans FA team roster and by causing her demotion from Primary to Alternate FA in the 2023/2024 Titans NFL season roster, after Ms. Imura had already been ranked 6th for that year, and was a Primary FA.

222.

This conduct by Ms. Lauderdale amounts to harassment of Ms. Imura based on her Asian race, ethnicity, culture and ancestry sufficient to rise to the level of objective illegal harassment under the law.

223.

Ms. Imura realleges ¶¶ 1, 17, 63, 64, 77-80, 89, 98, 101-102 and 104 establishing that Ms. Imura subjectively perceived her working environment to be hostile based on her Asian race, ethnicity, culture and ancestry.

224.

The harassment directed at Ms. Imura because of her Asian race, ethnicity, culture and ancestry was severe or pervasive so as to alter the terms and conditions of her employment, rising to the level of actionable harassment under the law.

225.

Witnesses provided statements to Delta confirming the day in and day out harassing treatment and severe bullying of Ms. Imura by Ms. Lauderdale because of Ms. Imura's Asian race, ethnicity, culture and ancestry and that Ms. Imura subjectively perceived her environment to be hostile, describing her as humiliated, appearing as though she wanted to disappear, and being suicidal after Ms. Lauderdale precipitated and caused her demotion from Primary FA on the Titans charter roster.

226.

Ms. Imura alleges that an Asian woman in her position would objectively construe the work environment at Delta to be permeated with hostility based on her Asian race, ethnicity, culture and ancestry and that she was objectively subjected to unwelcome harassment because of this.

227.

Ms. Imura complained to Delta about the aforementioned harassment based on her Asian race, ethnicity, culture and ancestry.

228.

Ms. Imura was harassed and singled out by Ms. Lauderdale and Delta as a non-African American person in the Atlanta market, which favored African-American employees over those who were not African-American, for example by derailing Ms. Imura's investigation into one involving a black/non-black racial issue, by allowing African-Americans to use the "N" word, including the full "N" word with impunity, and penalizing and indeed firing, non-African Americans for allegedly using the "N" word, when such use was clearly out of context. Accordingly, Ms. Imura was subjected to "reverse" discrimination and harassment by Delta since it favored Ms. Lauderdale who is African-American despite witness statements against her, other complaints against her, Ms. Lauderdale fabricating a

"racial" incident, Mr. Manley believing witnesses over Ms. Lauderdale, and Delta firing Mr. Manley for fabricated reasons instead of dealing with Ms. Lauderdale.

229.

Despite its pretense at an investigation, Delta never really investigated Ms. Imura's allegations based on harassment because of her Asian race, ethnicity, culture and ancestry, and rather, as Mr. Manley told Ms. Imura put her investigation under the table instead investigating Ms. Imura's witness, Graeme Wagner based on a fabricated allegation of racism by Ms. Lauderdale.

230.

To the extent that Mr. Manley and Ms. Darty conducted interviews, as of October 2023, witnesses had corroborated Ms. Imura's allegations of harassment by Mss. Lauderdale because of Ms. Imura's Asian race, ethnicity, culture and ancestry.

231.

Delta misleadingly told Ms. Imura and the EEOC that its investigation did not corroborate her allegations, but this was false.

232.

Delta took no steps to prevent or correct the harassment by Ms. Lauderdale of Ms. Imura, even after witnesses had corroborated it, requiring Ms. Imura to continue to fly flights with her harasser, until such time as Ms. Imura left Delta's charter

operations program, discontinued flying with the Titans, and took a backward career

step moving to Las Vegas and flying as a flight attendant in Delta's regular flight

program.

233.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating

that she has suffered economic and non-economic damages arising out of harassment

of her because of her Asian race, ethnicity, culture and ancestry. Ms. Imura has

suffered mental, emotional and economic damages as a result of Defendants'

aforesaid unlawful actions, as well as injury to reputation and pecuniary loss which is

continuing, and will continue into the future.

234.

Ms. Lauderdale's actions were wanton and willful, done with malice, or at the

least done with reckless or callous disregard of Delta's policies and Ms. Imura's

legal right to work in an environment free of unrelenting harassment because of her

Asian race, ethnicity, culture and ancestry, subjecting her to punitive damages. Ms.

Lauderdale's actions in making fabricated allegations of racism, impeding Delta's

investigation of Ms. Imura's allegations so that they were tabled in favor of

investigating her false allegation of racism of Ms. Imura's witness, Graeme Wagner,

were wanton, willful, and constitute an entire want of care which raise the

presumption of a conscious indifference to the consequences of her actions.

### EIGHTH CAUSE OF ACTION
### DISCRIMINATION BASED ON RACE, ETHNICITY, CULTURE AND ANCESTRY
### (42 U.S.C. §1981 – against Amber Lauderdale)

### 235.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully

herein.

### 236.

In particular, Ms. Imura realleges the allegations contained in regarding the

regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), and the nature of

the action (¶¶1, 17).

### 237.

In particular, Ms. Imura realleges ¶¶1, 5, 17 which set forth that she is a

Hawaiian Asian of Asian race, ethnicity, culture and ancestry and therefore in a

protected class.

### 238.

Ms. Imura realleges ¶¶ 34-36, 42-46, 68-70 establishing that she was qualified

to be an Alternate and then Primary flight attendant in Delta's IFS Charter Program

for the Tennessee Titans team.

239.

During the period that Ms. Imura was an Alternate flight attendant on the Titans' charter roster she was qualified for that position, indeed having a higher ranking than at least 6 other flight attendants on the Titans flight attendant roster.

240.

Ms. Imura was qualified to be a Primary FA in 2022 when she was moved into the 6th place rank, as roster numbers 1-6 were Primary FA positions.

241.

Ms. Imura was qualified to be a Primary FA in 2023 when she was in the 6th place rank, as roster numbers 1-6 were Primary FA positions.

242.

Ms. Imura realleges ¶¶ 1, 5, 17, 60-77 which set forth that Ms. Lauderdale harbored an anti-Asian bias, and subjected Ms. Imura to a hostile work environment that was severe or pervasive, because of that anti-Asian bias.

243.

Ms. Imura was subjected to different terms and conditions of employment which amount to unlawful discrimination based on her Asian race, ethnicity, culture and ancestry which was at least a motivating factor, including *inter alia*:

1) being subjected to hostile work environment motivated by anti-trans *animus*, which itself affected the terms and  conditions of her employment;

2) being denied flights as an Alternate FA, because Ms. Lauderdale "parked the flights" to avoid having Ms. Imura fly those trips;

3) being demoted from Primary to Alternate FA for the 2023-2024 Titans NFL season, after having been continued in the Primary FA position, following Ms. Lauderdale's statement to the Titans that the roster had to be changed to remove Ms. Imura from that position; and

4) being lowered in the Alternate rankings after that demotion so that she was now not even first Alternate (No. 7), and all of the individuals ahead of whom where Ms. Imura had been, were now re-ranked ahead of her, making it more difficult for Ms. Imura to get Titans charter trips, even as an Alternate.

244.

Ms. Imura realleges the allegations in her Third Cause of Action based on a hostile work environment because of Ms. Imura's Asian race, ethnicity, culture and ancestry since such a hostile environment is tantamount to subjecting Ms. Imura to different terms and conditions of employment based on an illegal discriminatory motive.

245.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 60-77 establishing

that Ms. Lauderdale's conduct in manipulating the schedule to preclude Ms. Imura

from being called to fly trips when Ms. Imura was an Alternate on the Titans roster

was illegal discrimination based on Ms. Imura's Asian race, ethnicity, culture and

ancestry and in fact injured her financially by denying her the ability to fly trips that

she was entitled to and should have been able to fly based on the applicable seniority

and ranking policies of the IFS Charter Program.

246.

Ms. Imura realleges the allegations contain in ¶¶1, 17, 60-77 establishing that

Ms. Lauderdale's conduct in precipitating Ms. Imura's demotion from Primary to

Alternate flight attendant for the 2023-2024 Titans NFL season illegally subjected

Ms. Imura to different terms and conditions of employment based on her Asian race,

ethnicity, culture and ancestry in fact injured her financially, and amounts to an

adverse employment action.

247.

Ms. Imura was harassed, singled out and discriminated against by Ms.

Lauderdale and Delta as a non-African American person in the Atlanta market,

which favored African-American employees over those who were not African-American, for example by derailing Ms. Imura's investigation into one involving a black/non-black racial issue, by allowing African-Americans to use the "N" word, including the full "N" word with impunity, and penalizing and indeed firing, non-African-Americans for allegedly using the "N" word, when such use was clearly out of context. Accordingly, Ms. Imura was subjected to "reverse" discrimination and harassment by Delta since it favored Ms. Lauderdale who is African-American despite witness statements against her, other complaints against her, Ms. Lauderdale fabricating a "racial" incident, Mr. Manley believing witnesses over Ms. Lauderdale, and Delta firing Mr. Manley for fabricated reasons instead of dealing with Ms. Lauderdale.

248.

Ms. Lauderdale violated Delta's purported policy against harassment and discrimination based on race, ethnicity, culture and ancestry, and singled Ms. Imura out for ostensible infractions that were fabricated, and in any event were committed by other FAs within Ms. Lauderdale's knowledge but ignored by her. Ms. Lauderdale contributed to derailing Delta's purported investigation into Ms. Imura's allegations against her by fabricating a claim of racism against Graeme Wagner, who Ms. Lauderdale knew was a witness corroborating Ms. Imura's

86

allegations. Delta was aware that witnesses had come forward corroborating Ms. Imura's allegations, and terminated Shawn Manley whose notes reflected this, and who would have concluded that Ms. Lauderdale was not credible. Mr. Manley told Ms. Imura that Delta put her investigation "under the table."

249.

Delta's own documents, including its letter to Ms. Imura regarding the Titans' ostensibly making the decision to re-order the 2023/2024 roster and its written statement to the EEOC, reflect that it cannot articulate a reason for Ms. Imura's demotion from Primary to Alternate for the 2023/2024 season, because according to Delta, the Titans did not provide or have to provide a reason.

250.

In addition, Ms. Wagner heard Ms. Lauderdale directing Brent Akers Sr. VP of the Titans Team Operations to change the 2023/2024 roster to get Ms. Imura out of the Primary FA position, that Mr. Akers asked Ms. Wagner whom he would need to email at the IFS charter program to do this, and Ms. Lauderdale respond that she would provide him the email to send the changed roster to. Accordingly, even if Delta can be deemed to be able to articulate a reason for the post initial 2023/2024 roster demotion of Ms. Imura, any reason would be pretextual to

conceal that the Titans acted at the behest of Ms. Lauderdale who repeatedly stated her intent to get Ms. Imura off the Titans charter flight attendant roster.

251.

The aforementioned conduct occurred because of Ms. Imura's Asian race, ethnicity, culture and ancestry, which was at least a motivating factor in that conduct.

252.

Ms. Imura realleges ¶¶ 1, 35-36, 64, 67, 77, 78, 98, 102, 104 demonstrating that she has suffered economic and non-economic damages arising out of harassment of her because of her Asian race, ethnicity, culture and ancestry. Ms. Imura has suffered mental, emotional and economic damages as a result of Delta's aforesaid unlawful actions, as well as injury to reputation and pecuniary loss which is continuing, and will continue into the future.

253.

Ms. Lauderdale's actions were wanton and willful, done with malice, or at the least done with reckless or callous disregard of Delta's policies and Ms. Imura's legal right to work in an environment free of unrelenting harassment and discrimination because of her Asian race, ethnicity, culture and ancestry, subjecting her to punitive damages. Ms. Lauderdale's actions in making fabricated allegations

of racism, impeding Delta's investigation of Ms. Imura's allegations so that they were tabled in favor of investigating her false allegation of racism of Ms. Imura's witness, Graeme Wagner, were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of her actions.

<u>NINTH CAUSE OF ACTION</u>
<u>INVASION OF PRIVACY – PUBLIC DISCLOSURE</u>
<u>OF EMBARRASSING PRIVATE FACTS</u>
<u>ABOUT THE PLAINTIFF –</u>
<u>(Against both Defendants)</u>

254.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully herein.

255.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), and the nature of the action (¶¶1, 17).

256.

In particular, Ms. Imura realleges ¶¶1, 2-4, 17, 28, 29 which set forth that she is a male to female transgender person and therefore in a protected class.

257.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 49, 51-55, 57-59, 61-64, 66-76, 89-90, 92, 98 establishing that Defendant Amber Lauderdale was motivated by illegal anti-trans *animus*.

258.

At all relevant times, Defendant Amber Lauderdale was employed by Defendant Delta.

259.

At all relevant times, Ms. Lauderdale's job title was A line/Flight Leader for the Titans IFS Charter.

260.

At all relevant times, it was within the scope of Ms. Lauderdale's job duties and authority to schedule rosters of FA's on charter flights within Delta's IFS charter program for the Tennessee Titans team during the period 2020 onwards until Delta lost the Titans charter contract.

261.

At all relevant times, it was within the scope of Ms. Lauderdale's job duties and authority to advise customers in Delta's IFS charter program, including

90

employees and agents of the Tennessee Titans professional football team, regarding the makeup of the FA's on their charter flights.

262.

On information and belief, on numerous occasions from 2020 through at least July 2023, acting in furtherance of Delta's business and business interests, Ms. Lauderdale advised customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, regarding the makeup of the FA's on their charter flights.

263.

On information and belief, on numerous occasions from 2020 through at least July 2023, in the course of advising customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, regarding the makeup of FA's on their charter flights, Ms. Lauderdale told them that Plaintiff was a transgender male to female person.

264.

At all relevant times, it was within the scope of Ms. Lauderdale's job duties and authority to advise other Delta employees regarding the makeup of the FA's on their charter flights.

265.

On information and belief, on numerous occasions from 2020 through at least July 2023, acting in furtherance of Delta's business and business interests , Ms. Lauderdale advised other employees of Delta regarding the makeup of the FA's on their charter flights.

266.

On information and belief, on numerous occasions from 2020 through at least July 2023, in the course of advising other Delta employees regarding the makeup of FA's on their charter flights, Ms. Lauderdale told them that Plaintiff was a trans person.

267.

The aforesaid actions of Ms. Lauderdale were within the scope of her job duties and authority as A line/Flight Leader for the Titans IFS Charter and were at least in part done in furtherance of Defendant Delta's business and business interests.

268.

Ms. Lauderdale repeatedly made statements about and outed Ms. Imura stating that she was "speaking for the team" and indicating that these actions were in furtherance of Delta's business and business interests.

269.

The aforesaid actions by Ms. Lauderdale were thus done in furtherance of the Defendant Delta's business and within the scope of her employment.

270.

The aforesaid actions by Ms. Lauderdale were thus not done for purely personal reasons entirely disconnected from Defendant Delta's business.

271.

Even though it was in furtherance of Delta's business and business interests for Ms. Lauderdale to advise customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, regarding the makeup of FA's on their charter flights, it was not necessary for Ms. Lauderdale in so doing to advise them that Plaintiff is a trans person.

272.

Even though it was in furtherance of Delta's business and business interests for Ms. Lauderdale to advise other Delta employees regarding the makeup of FA's on their charter flights, it was not necessary for Ms. Lauderdale in so doing to advise them that Plaintiff is a trans person.

273.

As a result of Ms. Lauderdale's aforesaid actions, she communicated to the public, the fact that Plaintiff who appeared and presented as female, was a transgender individual.

274.

The fact that Plaintiff had transitioned from male to female and was a transgender individual was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody.

275.

On information and belief, at all relevant times Ms. Lauderdale was aware that the fact that Plaintiff had transitioned from male to female and was a transgender individual was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody.

276.

The acts of Ms. Lauderdale advising customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, that Plaintiff who appeared and presented as female, was a transgender individual, even though Ms. Lauderdale was aware that that fact was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody,

and since it was not necessary for Ms. Lauderdale to make such advisements to those individuals in the course of communicating the rosters of FA's on those charter flights, was willful, wanton and malicious.

277.

The acts of Ms. Lauderdale advising other Delta employees that Plaintiff who appeared and presented as female, was a transgender individual, even though Ms. Lauderdale was aware that that fact was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody, and since it was not necessary for Ms. Lauderdale to make such advisements to those individuals in the course of communicating the rosters of FA's on those charter flights, was willful, wanton and malicious.

278.

The aforesaid acts of Ms. Lauderdale were done with malice, or with reckless disregard for the consequences of such acts, so as to make an award of punitive damages appropriate.

279.

Ms. Lauderdale's aforesaid unlawful actions were wanton and willful so as to make appropriate an award for punitive damages. Ms. Lauderdale's aforesaid actions were wanton, willful, and constitute an entire want of care which raise the

presumption of a conscious indifference to the consequences of Defendant

Lauderdale's actions.

280.

The aforesaid actions of Ms. Lauderdale inextricably intertwined Defendant

Delta's business interests with Ms. Lauderdale's personal interests as a person with

an *animus* against transgender individuals, so as to impute liability for invasion of

privacy to Ms. Lauderdale's employer, Defendant Delta.

281.

Ms. Imura has suffered mental, emotional and economic damages as a result of

the Defendant Lauderdale's aforesaid unlawful actions, as well as injury to reputation

and pecuniary loss which is continuing, and will continue into the future.

TENTH CAUSE OF ACTION<br>
INVASION OF PRIVACY – PLACING PLAINTIFF<br>
IN A FALSE LIGHT IN THE PUBLIC EYE<br>
– (Against both Defendants)

282.

Ms. Imura realleges ¶¶1- 107 with the same force and effect as if set forth fully

herein.

96

283.

In particular, Ms. Imura realleges the allegations contained in regarding the regarding the parties (¶¶2-14),  jurisdiction and venue (¶¶15-16), and the nature of the action (¶¶1, 17).

284.

In particular, Ms. Imura realleges ¶¶1, 2-4, 17, 28, 29 which set forth that she is a male to female transgender person and therefore in a protected class.

285.

In particular, Ms. Imura realleges ¶4, which alleges that Ms. Imura received an Order from the Lieutenant Governor of the State of Hawaii on or about July 10, 2013 legally changing her name to the female Shalani Keiko Imura and that all of Ms. Imura's legal documents have been changed to reflect her female gender, including her Social Security card, United States passport, and employment documents.

286.

Accordingly, Plaintiff is regarding as officially female by the State of Hawaii and by the United States.

287.

Ms. Imura realleges the allegations contained in ¶¶1, 17, 49, 51-55, 57-59, 61-64, 66-76, 89-90, 92, 98 establishing that Defendant Amber Lauderdale was motivated by illegal anti-trans *animus*.

288.

At all relevant times, Defendant Amber Lauderdale was employed by Defendant Delta.

289.

At all relevant times, Ms. Lauderdale's job title was A line/Flight Leader for the Titans IFS Charter.

290.

At all relevant times, it was within the scope of Ms. Lauderdale's job duties and authority to schedule rosters of FA's on charter flights within Delta's IFS charter program for the Tennessee Titans team during the period 2020 onwards until Delta lost the Titans charter contract.

291.

At all relevant times, it was within the scope of Ms. Lauderdale's job duties and authority to advise customers in Delta's IFS charter program, including

employees and agents of the Tennessee Titans professional football team, regarding the makeup of the FA's on their charter flights.

293.

On information and belief, on numerous occasions from 2020 through at least July 2023, acting in furtherance of Delta's business and business interests, Ms. Lauderdale advised customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, regarding the makeup of the FA's on their charter flights.

293.

On information and belief, on numerous occasions from 2020 through at least July 2023, in the course of advising customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, regarding the makeup of FA's on their charter flights, Ms. Lauderdale told them that Plaintiff was a transgender male to female person.

294.

At all relevant times, it was within the scope of Ms. Lauderdale's job duties and authority to advise other Delta employees regarding the makeup of the FA's on their charter flights.

99

295.

On information and belief, on numerous occasions from 2020 through at least July 2023, acting in furtherance of Delta's business and business interests , Ms. Lauderdale advised other employees of Delta regarding the makeup of the FA's on their charter flights.

296.

On information and belief, on numerous occasions from 2020 through at least July 2023, in the course of advising other Delta employees regarding the makeup of FA's on their charter flights, Ms. Lauderdale told them that Plaintiff was a trans person.

297.

The aforesaid actions of Ms. Lauderdale were within the scope of her job duties and authority as A line/Flight Leader for the Titans IFS Charter and were at least in part done in furtherance of Defendant Delta's business and business interests.

298.

Ms. Lauderdale repeatedly made statements about and outed Ms. Imura stating that she was "speaking for the team" and indicating that these actions were in furtherance of Delta's business and business interests.

100

299.

The aforesaid actions by Ms. Lauderdale were thus done in furtherance of the Defendant Delta's business and within the scope of her employment.

300.

The aforesaid actions by Ms. Lauderdale were thus not done for purely personal reasons entirely disconnected from Defendant Delta's business.

301.

Even though it was in furtherance of Delta's business and business interests for Ms. Lauderdale to advise customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, regarding the makeup of FA's on their charter flights, it was not necessary for Ms. Lauderdale in so doing to advise them that Plaintiff is a trans person.

302.

Even though it was in furtherance of Delta's business and business interests for Ms. Lauderdale to advise other Delta employees regarding the makeup of FA's on their charter flights, it was not necessary for Ms. Lauderdale in so doing to advise them that Plaintiff is a trans person.

303.

As a result of Ms. Lauderdale's aforesaid actions, she falsely communicated to the public, the fact that Plaintiff who appeared and presented as female, and who was officially considered to be female by the State of Hawaii and the United States, was a male.

304.

The act of Ms. Lauderdale communicating to the public that Ms. Imura is a transgender individual, was to effectively communicate that she is "really" male, even though, as pled above, she was officially female at the time that Ms. Lauderdale made those communications.

305.

Plaintiff realleges ¶51, that, on an early trip in the 2020 NFL season, Ms. Graeme Wagner, was walking through the Atlanta airport with Ms. Lauderdale and Ms. Hearon when Ms. Hearon stated regarding Ms. Imura, "I think that's a dude," and Ms. Lauderdale agreed, stating, look at his "knuckles and calves." This demonstrates that by communicating to the public that Ms. Imura is a transgender individual, she (Ms. Lauderdale) intended to communicate that Plaintiff is "actually" male, which was false according to the State of Hawaii and the United States.

306.

The fact that Plaintiff had transitioned from male to female and was a transgender individual was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody.

307.

On information and belief, at all relevant times Ms. Lauderdale was aware that the fact that Plaintiff had transitioned from male to female and was a transgender individual was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody.

308.

The acts of Ms. Lauderdale advising customers in Delta's IFS charter program, including employees and agents of the Tennessee Titans professional football team, that Plaintiff who appeared and presented as female, was a transgender individual, even though Ms. Lauderdale was aware that that fact was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody, and since it was not necessary for Ms. Lauderdale to make such advisements to those individuals in the course of communicating the rosters of FA's on those charter flights, was willful, wanton and malicious.

309.

The acts of Ms. Lauderdale advising other Delta employees that Plaintiff who appeared and presented as female, was a transgender individual, even though Ms. Lauderdale was aware that that fact was an embarrassing private fact that Plaintiff had not revealed to anybody and did not wish to reveal to anybody, and since it was not necessary for Ms. Lauderdale to make such advisements to those individuals in the course of communicating the rosters of FA's on those charter flights, was willful, wanton and malicious.

310.

The aforesaid acts of Ms. Lauderdale were done with malice, or with reckless disregard for the consequences of such acts, so as to make an award of punitive damages appropriate.

311.

Ms. Lauderdale's aforesaid unlawful actions were wanton and willful so as to make appropriate an award for punitive damages. Ms. Lauderdale's aforesaid actions were wanton, willful, and constitute an entire want of care which raise the presumption of a conscious indifference to the consequences of Defendant Lauderdale's actions.

312.

The aforesaid actions of Ms. Lauderdale inextricably intertwined Defendant

Delta's business interests with Ms. Lauderdale's personal interests as a person with

an *animus* against transgender individuals, so as to impute liability for invasion of

privacy to Ms. Lauderdale's employer, Defendant Delta.

313.

Ms. Imura has suffered mental, emotional and economic damages as a result of

the Defendant Lauderdale's aforesaid unlawful actions, as well as injury to reputation

and pecuniary loss which is continuing, and will continue into the future.

<u>ELEVENTH CAUSE OF ACTION</u>
<u>(PUNITIVE DAMAGES)</u>
<u>(GEORGIA COMMON LAW –</u>
<u>Against both Defendants)</u>

314.

Plaintiff realleges each and every allegation contained in ¶¶1-107 to the same

force and effect as if set forth separately herein.

315.

The aforesaid conduct of the Defendants showed willful misconduct, malice,

wantonness, oppression or that entire want of care which would raise the

presumption of conscious indifference to consequences sufficient to entitle Ms.

Imura to punitive damages from Defendants under O.C.G.A. §51-12-5.1(b).

105

## TWELTH CAUSE OF ACTION
## (ATTORNEYS' FEES PURSUANT TO OCGA § 13–6–11
## Against both Defendants)

### 316.

Ms. Imura re-alleges each and every allegation contained in ¶¶1-107 to the same force and effect as if set forth separately herein.

### 317.

Ms. Imura's  aforesaid allegations against Defendants raise intentional tort claims that subject them to liability for Plaintiff's attorneys' fees under O.C.G.A. §13-6-11.

WHEREFORE, Plaintiff seeks the following relief:

1. That process issue and this Court take jurisdiction over this case;

2. That this Court exercise supplemental jurisdiction;

3. Judgment against Defendants and for the Plaintiff;

4. Compensatory damages for the Defendants' violations of law enumerated herein embodying make-whole relief for Plaintiff's economic damages, including but not limited to full back-pay and benefits of employment,

5. Damages for mental anguish;

6. Damages for injury to Plaintiff's professional reputation and damage to her career;

7. Damages for present and future pecuniary loss;

8. Judgment against Defendant and for Plaintiff, affording declaratory relief, and permanently enjoining Defendant from future violations of law enumerated herein;

9. Appropriate injunctive relief;

10. Reinstatement to Plaintiff's Primary FA position;

11. Front pay in the event that reinstatement is not possible;

12. Punitive damages against Defendants;

13. Prejudgment interest and post-judgment interest;

14. Attorneys' fees, expert witness fees, costs and disbursements of this action;

15. All equitable relief that is allowed by law; and

16. Such other and further relief as this Court deems appropriate.

JURY DEMAND

Plaintiff demands TRIAL BY JURY on all issues so triable.

This 9th day of June 2025.

> Respectfully submitted,
> /s/Jean Simonoff Marx
> Jean Simonoff Marx
> Georgia Bar No. 465276
> jeannie.marx@marxlawgroup.com

107

Robert N. Marx
Georgia Bar Number 475280
lawyers@marxlawgroup.com
Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
404) 261-9559

*Attorneys for Plaintiff Shalani Imura*